**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |
|---|---|
| CAPITAL ONE FINANCIAL CORPORATION<br>1680 Capital One Drive<br>McLean, VA 22102,<br><br>   Plaintiff,<br><br> v.<br><br>JOHN DOES 1-10,<br><br>   Defendants. | Civil Action No. |

## COMPLAINT

Plaintiff Capital One Financial Corporation ("Capital One" or "Plaintiff"), through counsel, alleges as follows for its Complaint against Defendants John Does 1–10 ("Defendants"), seeking the disabling of telephone, text message, email, and website scam campaigns that violate consumers' rights and infringe upon Plaintiff's goodwill and valuable trademark rights.

## NATURE OF THE SUIT

1. This is an action against Defendants for trademark infringement, trademark counterfeiting, false designation of origin, and false advertising under the Lanham Act, 15 U.S.C. §§ 1114(1) & 1125(a); deceptive and abusive telemarketing practices under the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101–08, and the Telemarketing Sales Rule, 16 C.F.R. § 310; unfair competition under the Virginia Consumer Protection Act, Va. Code Ann. § 59.1-200; and false advertising under Va. Code Ann. § 18.2-216.

2. Without Capital One's authorization or consent, or the authorization or consent of Capital One's predecessor-in-interest to the DISCOVER trademarks, Capital One's invaluable

rights in the distinctive CAPITAL ONE and DISCOVER trademarks have been deliberately infringed through Defendants' unauthorized use of the CAPITAL ONE and DISCOVER trademarks via illegal telephone, text message, email, and website scam campaigns. Using these illegal communications referencing the CAPITAL ONE and DISCOVER trademarks, Defendants misled and/or deceived consumers, and targeted consumers across the country, including specifically in this Court's district, wrongfully and illegally masquerading as Capital One or its predecessor through unlawful use of the CAPITAL ONE and DISCOVER trademarks.

3. The consuming public is being misled and confused by Defendants' misconduct. As a result, Capital One and the consuming public will suffer irreparable harm unless this Court acts to halt the unauthorized and fraudulent use of the CAPITAL ONE and DISCOVER trademarks.

## PARTIES

4. Capital One Financial Corporation is a Delaware corporation with its principal place of business at 1680 Capital One Drive, McLean, Virginia 22102, U.S.A.

5. Defendants John Does 1-10 are persons and/or entities of unknown identity who have initiated, operated, and/or facilitated telephone, text message, email, and website scam campaigns that misuse the CAPITAL ONE and DISCOVER trademarks.

## JURISDICTION, VENUE, AND JOINDER

6. This Court has original jurisdiction over Plaintiff's Lanham Act claims under 15 U.S.C. §§ 1114, 1121(a), 1125(a), and 1125(d), and 28 U.S.C. §§ 1331 and 1338(a). The Court has original jurisdiction over Plaintiff's Telemarketing and Consumer Fraud and Abuse Prevention Act and Telemarketing Sales Rule claims under 15 U.S.C. § 6104(a) and 28 U.S.C. § 1331.

7. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

8.      The Court has *in personam* jurisdiction over Defendants because Plaintiff's claims against Defendants for trademark infringement, trademark counterfeiting, false designation of origin, false advertising, deceptive and abusive telemarketing practices, and unfair competition are based on Defendants' misuse of the CAPITAL ONE and DISCOVER trademarks in communications to consumers throughout the country and located in this district.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.

## CAPITAL ONE'S RIGHTS IN THE CAPITAL ONE AND DISCOVER MARKS

10.      Capital One is one of the largest and best-known institutions in the financial industry.  The company has operated continuously since 1994, offering a broad range of financial services, including credit and debit cards, deposit accounts, and auto financing.

11.      Capital One is a Fortune 500 company.  It trades on the New York Stock Exchange under the symbol "COF" and is included in the S&P 100 index.

12.      Capital One spends billions of dollars annually advertising, marketing, and promoting its CAPITAL ONE-branded products and services through a variety of national media, including television, radio, internet, direct mail, and print advertisements.  From 2008 to 2023, Capital One spent almost $30 billion advertising and promoting the CAPITAL ONE name and mark, including more than $4 billion in both 2022 and 2023 alone.

13.      Capital One has received extensive media coverage and numerous corporate and business awards, including:

- Business Week's "Top 50" performers in the S&P 500

- Forbes "America's Most Reputable Companies"

- Fortune 500 list of America's largest companies

- Fortune's "World's Most Admired Companies"

- Fortune's "100 Best Companies to Work For List"

- Credit Card Magazine's "Issuer of the Year"

- U.S. Banker's "Five Best of the Nation's Largest 100 Banking Companies"

- Information Week 500 for innovation in IT

- CIO 100 award for customer excellence and IT

- Working Mother's 100 Best Companies

14. The CAPITAL ONE mark is inherently distinctive and entitled to broad common law trademark rights based on Capital One's extensive use and promotion of the CAPITAL ONE mark, and the recognition and goodwill the mark has achieved in the eyes of the consuming public.

15. In addition to its broad common law trademark rights in the CAPITAL ONE mark, Capital One possesses statutory rights in the CAPITAL ONE mark by virtue of its ownership of numerous federal trademark registrations for marks comprising and/or containing CAPITAL ONE (collectively the "CAPITAL ONE Marks" and detailed in Ex. 1), including:

| Trademark | Registration No. | Services |
|---|---|---|
| CAPITAL ONE | 2065991 | credit card services, namely, processing, underwriting, issuing, servicing and administering credit cards and secured cards |
| CAPITAL ONE | 3442400 | banking and financial services, namely, credit card services; mortgage lending and home equity loans; farm equipment, automobiles and recreational vehicle financing; secured and unsecured installment loans; certificate of deposits, individual retirement accounts, money |

| | | market, and checking accounts; investment brokerage including stocks, bonds and mutual funds; retirement planning; trust services; management of mutual funds |
|---|---|---|
| CAPITAL ONE | 7242537 | banking services; internet banking services; issuing credit cards; financing services; financing relating to automobiles; installment loans; commercial lending services |

16.　　The aforementioned registrations constitute prima facie and/or conclusive evidence of the validity of, and Capital One's exclusive rights to use, the CAPITAL ONE Marks.

17.　　On February 19, 2024, Capital One and Discover Financial Services ("Discover") announced they had entered into a definitive agreement under which Capital One would acquire Discover for $35 billion.

18.　　Capital One's acquisition of Discover was completed on May 18, 2025, with Discover merging into Capital One.[1]

19.　　The transaction brought together two of the biggest brands in the financial services industry – companies with long-standing track records of delivering attractive financial results, award-winning customer experiences, breakthrough innovation, and financial inclusion.

20.　　Discover, now merged into Capital One Financial Corporation, has offered products including credit cards, debit cards, personal loans, and deposit products.

---

[1] For ease of reference, as used in this Complaint, "Capital One" means both Capital One Financial Corporation and Discover Financial Services, as appropriate. For instance, instead of referencing Discover owning the legacy DISCOVER Marks, this Complaint will reference Capital One's ownership, which includes the time when those marks were owned by Discover.

21.     Since as early as 1985, Discover offered services under the house mark DISCOVER, both alone and with other words and designs (collectively the "DISCOVER Marks"). In the three-year period that ended on December 31, 2023, alone, Discover invested over $900 million in advertising expenses, including extensive television and radio commercials throughout the U.S.

22.     As a result of long and continuous use of the DISCOVER Marks and substantial investment of time, money, and effort in advertising and promotion, the DISCOVER Marks have developed substantial public recognition and incalculable goodwill.  As such, the DISCOVER Marks are known throughout the U.S. as a unique source identifier pointing to Capital One and previously to its predecessor-in-interest Discover.

23.     In addition to the broad common law trademark rights in the DISCOVER Marks, Capital One possesses statutory rights in the DISCOVER Marks by virtue of its ownership of numerous federal trademark registrations (detailed in Ex. 2), including:

| Trademark | Registration No. | Services |
| --- | --- | --- |
| DISCOVER | 1479946 | financial services; proprietary credit card services |
| DISCOVER | 2501064 | banking services; banking services, namely, banking services, credit card, debit card and stored value authentication and payment verification |
| DISCOVER | 2658527 | financial services, namely, consumer lending service |

24.     The aforementioned registrations constitute prima facie and/or conclusive evidence of the validity of, and Capital One's exclusive rights to use, the DISCOVER Marks.

25.    Capital One frequently encounters third parties' attempts to misuse the CAPITAL ONE Marks and DISCOVER Marks to confuse, mislead, and/or deceive consumers.  To protect both consumers and its valuable marks, Capital One has engaged in significant enforcement efforts relating to its intellectual property.  Its efforts include being a member of the Communications Fraud Control Association,[2] defensive domain name registrations, administrative proceedings under the Uniform Domain Name Dispute Resolution Policy, take-down notices, and trademark infringement and anti-cybersquatting actions, including litigation in this Court and others.  *See, e.g., Capital One Fin. Corp. v. Discovercapitalone.com*, 1:24-cv-470 (E.D. Va. Mar. 25, 2024) (combined effort by Capital One and Discover to enforce their trademark rights); *Capital One Fin. Corp. v. Velocity-black.com*, 1:23-cv-861 (E.D. Va. June 30, 2023); *Capital One Fin. Corp. v. Capital One Auto Grp. 1 Inc. (New York)*, 2:19-cv-7201 (E.D.N.Y. Dec. 23, 2019); *Capital One Fin. Corp. v. Capital Fin., Inc.*, 8:05-cv-2246 (M.D. Fla. Dec. 7, 2005); *Capital One Fin. Corp. v. Upshur*, 1:00-cv-1388 (E.D. Va. Aug. 16, 2000).

26.    Capital One has defensively registered a number of domain names similar to domains used by bad actors such as, for example, cap1discover.com, cap1discovernetwork.com, cap1discoverpulse.com, capitalonediscover.app, capitalonediscover.biz, capitalonediscover.business, capitalonediscover.ca, capitalonediscover.cards, capitalonediscover.co, capitalone-discover.co, capitalonediscover.co.com, capitalonediscover.co.uk, capitalonediscover.com, capitalone-discover.com, capitalonediscover.company, capitalonediscover.group, capitalone-discover.info,

---

[2] The Communications Fraud Control Association is a nonprofit international organization dedicated to fraud risk management, prevention, and profitability control in the communications industry through education, information sharing, and collaboration among experts and law enforcement.

capitalonediscover.international, capitalonediscover.loan, capitalonediscover.management, capitalonediscover.mobi, capitalonediscover.money, capitalonediscover.net, capitalone-discover.net, capitalonediscover.network, capitalonediscover.news, capitalonediscover.org, capitalone-discover.org, capitalonediscover.review, capitalonediscover.services, capitalonediscover.software, capitalonediscover.support, capitalonediscover.technology, capitalonediscover.uk, capitalonediscover.us, capitalonediscover.work, capitalonediscoverbank.com, capitalonediscovercards.com, capitalonediscoverdeal.com, capitalonediscovered.net, capitalonediscoverfx.com, capitalonediscoverfxtrading.com, capitalonediscovermerger.com, capitalonediscovernetwork.com, capitalonediscovernetworks.com, capitalonediscoverpayments.com, capitalonediscoverpulse.com, capitalonediscoverpulsenetwork.com, capitalonerediscovermobile.biz, capitalonerediscovermobile.ca, capitalonerediscovermobile.co.uk, capitalonerediscovermobile.com, capitalonerediscovermobile.info, capitalonerediscovermobile.mobi, capitalonerediscovermobile.net, capitalonerediscovermobile.org, capitalonerediscovermobile.us, discovercapitalone.com, discovercapitalone.net, discovercapitalone.online, discovercapitalone.org, discovercapitalonedeal.com, discovercapitalonemerger.com, discovercapitalonenetwork.com, discovercapitalonenetworks.com, discovercapitalonepayments.com, discovercapitalonepulse.com, pulsediscovernetwork.com, pulseofdiscover.com, pulseondiscover.com, thecapitalonediscovernetwork.com, and thediscovernetwork.com.

**BACKGROUND ON FRAUD AGAINST CONSUMERS**

27.    Telephonic fraud comprises a number of tactics, including telemarketing, robocallers, live callers, and spoofed calls, which scammers may use in combination, including in misrepresenting their affiliation with a known entity, company, or brand.

28.    The Federal Communications Commission ("FCC") defines telemarketing as "[t]he initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."  Telephone Consumer Protection Act ("TCPA"), 47 C.F.R. § 64.1200(f)(13); *see also* Telemarketing Sales Rule, 16 C.F.R. § 310.2(ii) (Federal Trade Commission ("FTC") definition as a "plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call").

29.    Robocalls involve automated calls that use a recording or a live person in violation of federal and/or state telemarketing regulations.  FTC, *Robocalls*, https://consumer.ftc.gov/articles/robocalls (last visited May 12, 2026).

30.    Robocalls "can be made in large numbers with little expense, leading to a significant increase in telemarketing robocalls, including illegal robocalls."  Press Release, FTC, FTC Issues Biennial Report to Congress on the National Do Not Call Registry (May 12, 2026), https://www.ftc.gov/news-events/news/press-releases/2026/01/ftc-issues-biennial-report-congress-national-do-not-call-registry.

31.    Robocalls are not merely an annoyance to consumers but a pervasive problem that disrupts, disturbs, and defrauds consumers on an enormous scale.  Robocalls often include unauthorized use of a third-party's brand as the "bait" and include auto warranty scams, online shopping "suspicious charge" scams, social security administration scams, tech support scams,

utility company impersonation scams, loan relief scams, and many more types of scams that seek to trick consumers into providing financial information, credit card information, demand deposit account information, or other personally identifiable information. *See* FTC, *Robocall Scam Examples*, https://consumer.ftc.gov/features/robocall-scam-examples (last visited May 12, 2026).

32.    Some fraudsters also use live calls for phone scams. These scams are particularly problematic because consumers tend to trust a real person claiming affiliation with a familiar company. Alvaro Puig, *Did You Get a Call or Text About a Suspicious Purchase on Amazon? It's a Scam*, FTC (Mar. 7, 2024), https://consumer.ftc.gov/consumer-alerts/2024/03/did-you-get-call-or-text-about-suspicious-purchase-amazon-its-scam; FTC, *False Alarm, Real Scam: How Scammers are Stealing Older Adults' Life Savings* (Aug. 7, 2025), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2025/08/false-alarm-real-scam-how-scammers-are-stealing-older-adults-life-savings ("A call is still the best way to dial up the fear and the urgency so it's harder for you to think clearly and check things out.").

33.    Another tactic used by telephone scammers is spoofed calls. Spoofing is when scammers falsify caller ID information to conceal their identity, often making scam calls appear to originate from a local number or from trusted companies or government agencies. FCC, *Caller ID Spoofing*, https://www.fcc.gov/consumers/guides/spoofing (last visited May 12, 2026).

34.    Impersonation scams are "consistently among the top frauds reported to the FTC's Consumer Sentinel Network." FTC, *Impersonation Scams: Not What They Used to be*, Data Spotlight (Apr. 1, 2024), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2024/04/impersonation-scams-not-what-they-used-be.

35.    In 2023, there were over 330,000 reports of business impersonation scams, and 148,000 of those were through phone calls. *Id.* In 2024, government and business impersonation

scams targeting adults over 60, utilizing live phone calls, resulted in losses totaling $700 million. FTC, *False Alarm, Real Scam: How Scammers Are Stealing Older Adults' Life Savings*, Data Spotlight (Aug. 7, 2025), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2025/08/false-alarm-real-scam-how-scammers-are-stealing-older-adults-life-savings ("these scams still depend on a phone call").

36.    Live phone call scams often start with a story, trying to either "act friendly and helpful," or "threaten or try to scare" consumers.    FTC, *Phone Scams*, https://consumer.ftc.gov/articles/phone-scams (last visited May 12, 2026); FTC, *False Alarm, Real Scam: How Scammers are Stealing Older Adults' Life Savings*, Data Spotlight (Aug. 7, 2025), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2025/08/false-alarm-real-scam-how-scammers-are-stealing-older-adults-life-savings ("There may be layers of complexity to the story, but it's all a lie aimed at draining your accounts.").

37.    These stories range from prizes that cost money to obtain, fake taxes or debt collection, business coaching, travel scams, or fake fraud alerts.  *Id.*; Alvaro Puig, *Three Ways Scammers Try to Steal Your Money*, FTC (Oct. 25, 2024), https://consumer.ftc.gov/consumer-alerts/2024/10/three-ways-scammers-try-steal-your-money.  After creating a story to gain the trust of consumers, fraudsters then "insist you pay in a way that makes it hard to get your money back—by wire transfer, gift card, cryptocurrency, or payment app."  FTC, *Phone Scams*, https://consumer.ftc.gov/articles/phone-scams (last visited May 12, 2026).

38.    This pervasive and unwelcome violation of consumers' rights is felt on a national scale, including specifically here in Virginia.  In each of 2024 and 2025, more than 1.2 billion robocalls were made to consumers located in Virginia.  YouMail, *Robocall Index*, https://robocallindex.com/history/states (last visited May 12, 2026).

39.    Notwithstanding extensive efforts by Capital One and others to combat telephone scams, the financial harm to consumers can be devastating, including loss of sensitive personal information such as social security numbers and account numbers, loss of access and control of financial accounts, identity theft, and outright financial theft.

40.    In response to the mounting "public criticism of abusive telephone marketing practices" and American "outrage[] over the proliferation of intrusive, nuisance calls to their homes from telemarketers," Congress enacted the TCPA.  *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 649 (4th Cir. 2019) (citing TCPA, Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227 (2012)).

41.    In so doing, Congress sought to "strike a balance between '[i]ndividuals' privacy rights, public safety interests, and commercial freedoms." *Id.* (citing TCPA §§ 2(6), (9), 105 Stat at 2394).  Federal agencies, states, and individuals can enforce the TCPA.  *Id.* (*see Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370 (2012)).

42.    Additionally, the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101–08, authorized the FTC, a federal agency whose mission includes safeguarding consumers' rights, to develop protective rules.  One such rule is the Telemarketing Sales Rule, 16 C.F.R. § 310 (2019). *See Nat'l Fed'n of the Blind v. FTC*, 420 F.3d 331, 334 (4th Cir. 2005).  The Telemarketing Sales Rule "impose[s] several restrictions on telemarketers—requiring them, inter alia, to make certain disclosures, obey time restrictions, and refrain from calling consumers who have asked not to be called by that particular seller." *Id.*

43.    Enforcement of these protective laws and rules has been strong and swift.

44.    For instance, in 2024, Voice over Internet Protocol ("VoIP") provider XCast Labs, Inc., agreed to settle FTC charges under the Telemarketing Sales Rule that it funneled hundreds of

millions of illegal robocalls through its network, even after receiving multiple warnings about the unlawful conduct. Under the court order, XCast was required to implement a screening process and end its relationships with firms that were not complying with telemarketing-related laws. *See* Press Release, FTC, XCast Labs Will Be Banned from Supporting Illegal Telemarketing Practices to Settle FTC Charges It Assisted and Facilitated in Sending Hundreds of Millions of Illegal Robocalls (Jan. 2, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/01/xcast-labs-will-be-banned-supporting-illegal-telemarketing-practices-settle-ftc-charges-it-assisted.

45.  In another instance, an international robocall enterprise "placed over five billion auto warranty robocalls to consumers between January 2021 and March 2021 in violation of the Telephone Consumer Protection Act . . . and Truth in Caller ID Act." *In re Sumco Panama SA et al.*, Forfeiture Order, 38 FCC Rcd 7235, ¶ 1 (2023). The prerecorded messages falsely promoted vehicle service contracts as legitimate auto warranties. *Id.* ¶ 2. The FCC imposed a "record-breaking $299,997,000.00 fine" against the enterprise for orchestrating "the largest illegal robocall operation the agency has ever investigated." Press Release, FCC, FCC Imposes Record Penalty Against Transnational Illegal Robocalling Operation (Aug. 3, 2023), https://docs.fcc.gov/public/attachments/DOC-395728A1.pdf.[3]

46.  The FCC also assessed a forfeiture in the amount of $225,000,000.00 against John C. Spiller[4] and Jakob A. Mears for making one billion spoofed robocalls over four months in violation of the same Act. *In re John C. Spiller et al.*, Forfeiture Order, 36 FCC Rcd 6225, ¶ 2

---

[3] The Truth in Caller ID Act is enforced by the FCC and, unlike the TCPA, does not have a private cause of action. In addition to the FCC's actions, Ohio's Attorney General filed an enforcement action against the same enterprise in the Southern District of Ohio. *See State of Ohio, ex rel. Att'y Gen. Dave Yost v. Aaron Michael Jones*, No. 2:22-cv-2700, (S.D. Ohio July 7, 2022).

[4] Mr. Spiller was also sued by multiple State Attorneys General in the Southern District of Texas in connection to the robocalls he made. *See Texas v. Rising Eagle Cap. Grp.*, 4:20-cv-2021 (S.D. Tex. June 9, 2020).

(2021). The prerecorded messages concerned the sale of health insurance plans and contained false or misleading caller ID information and falsely implied that their company was associated with well-known health insurance companies. *Id.*

47.    In 2024, the FCC issued five cease and desist letters to companies involved in the transmission of illegal robocalls and, on August 5, 2025, the FCC removed 185 non-compliant providers from its Robocall Mitigation Database. *See* FCC, *Robocall Facilitators Must Cease and Desist*, https://www.fcc.gov/robocall-facilitators-must-cease-and-desist (last visited May 12, 2026).

48.    Despite the consequences of these federal enforcement actions, Defendants remain undeterred and continue their illicit telemarketing and business impersonation scams.

49.    Indeed, a recent FTC Press Release reported that the "combined losses reported by older adults who lost more than $100,000 increased eight-fold, from $55 million in 2020 to $445 million in 2024." Press Release, FTC, FTC Data Show a More Than Four-Fold Increase in Reports of Impersonation Scammers Stealing Tens and Even Hundreds of Thousands from Older Adults (Aug. 7, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/08/ftc-data-show-more-four-fold-increase-reports-impersonation-scammers-stealing-tens-even-hundreds?utm_source=govdelivery.

50.    Although laws have been enacted and rules have been passed to address unlawful telemarketing calls and texts, "[i]llegal robocalls calls remain a scourge." Press Release, FTC, Reports of Unwanted Telemarketing Calls Down More Than 50 Percent Since 2021 (Nov. 15, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/11/reports-unwanted-telemarketing-calls-down-more-50-percent-2021.

51.    In addition to telephonic fraud, "[t]ext message scams are an increasingly pervasive consumer threat, with a more than 500 percent increase in complaints in recent years." FCC, 2024 Report on Robocalls and Transmission of Misleading or Inaccurate Caller Identification Information, at 10 (Dec. 27, 2024), https://docs.fcc.gov/public/attachments/DOC-408475A1.pdf.

52.    In April 2025, the FTC published a blog post stating that "text scam losses are skyrocketing. In 2024 people reported $470 million in losses to text scams, more than five times the amount reported in 2020." FTC, *New FTC Data Spotlight Highlights Text Scams That May Target Your Business*, Business Blog (Apr. 16, 2025), https://www.ftc.gov/business-guidance/blog/2025/04/new-ftc-data-spotlight-highlights-text-scams-may-target-your-business.

53.    However, "this number likely reflects only a fraction of the actual harm," because the "vast majority of fraud" goes unreported. FTC, *Top Text Scams of 2024*, Data Spotlight (Apr. 14, 2025), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2025/04/top-text-scams-2024.

54.    The following figure illustrates how scammers have broadened their methods for making their initial contact, greatly increasing their use of text and email:



**Changing Contact Methods**

From 2020-2023, reports of scams starting with a phone call are down, while reports of scams starting with email or text are up.

Figures are based on the total number of reports to the FTC Consumer Sentinel Network classified as business imposter or government imposter. Reports provided by Sentinel data contributors and reports that did not indicate a contact method are excluded.

FTC, Consumer Sentinel Network Data Book 2023 (Feb. 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/CSN-Annual-Data-Book-2023.pdf.

55.     As with telephone fraud, text message and email scams frequently involve scammers' impersonation of a well-known entity, company, or brand to mislead recipients and gain their trust.

56.     In 2024, 13% of older adults reported losing $10,000 or more to a business or government imposter scam, indicating the initial contact method was an email.  FTC, *False Alarm, Real Scam: How Scammers are Stealing Older Adults' Life Savings*, Data Spotlight (Aug. 7, 2025), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2025/08/false-alarm-real-scam-how-scammers-are-stealing-older-adults-life-savings.

57.     In 2025, "24% [of U.S. adults] say they got a scam email, text message or call that led them to give away personal information."  *See* Jeffrey Gottfried, Eugenie Park & Monica Anderson, *Online Scams and Attacks in America Today*, Pew Research Center (July 31, 2025), https://www.pewresearch.org/internet/2025/07/31/online-scams-and-attacks-in-america-today/.

58.     Further, 28% of U.S. adults "say they get daily scam emails," and 20% said they encounter scam text messages "on a daily basis." *Id.*  The numbers only rise when you look at weekly occurrences. *Id.*

59.     Additionally, government reports underscore the growing prevalence of business impersonation scams that spoof websites, along with associated trademark infringement and resulting harm to consumers and brands.

60.     The Federal Bureau of Investigation ("FBI") reported that in 2024, of the 860,000 complaints it received concerning internet scams, 193,407 concerned phishing or spoofing, and those complaints resulted in over $70 million in losses.  FBI Internet Crime Complaint Center, Federal Bureau of Investigation Internet Crime Report 2024 (Apr. 23, 2025), https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

61.     Spoofing websites have become increasingly sophisticated, misusing registered trademarks for purposes beyond merely diverting internet traffic intended for the rightful owner.

62.     Business impersonators engage in bad acts, including leveraging trademark recognition to collect visitors' personal information for inappropriate or illegal uses, to generate revenue by displaying pay-per-click advertisements related to the legitimate site, or even to display counterfeit versions of brand owners' goods or services.

63.     Business impersonation scams harm consumers by causing confusion with the legitimate sites being sought by the consumers and very often result in consumers' personal

information being collected and misused, and/or consumers being presented with an endless stream of unwanted advertisements.

<strong><u>DEFENDANTS' UNLAWFUL ACTS</u></strong>

64.    Defendants are scammers who attempt to establish the legitimacy of their fraudulent solicitations and/or seek to induce consumers to continue communicating by falsely claiming to be associated or affiliated with a well-known brand.

65.    As relevant here, Defendants target Capital One's customers and the general public through various scams involving the use of phone calls, text messages, emails, and spoofed websites that falsely claim association or affiliation with Capital One, and rely on consumer recognition of the CAPITAL ONE Marks and DISCOVER Marks.

66.    By perpetrating these scams, Defendants induce Capital One customers and/or the general public to unknowingly approve fraudulent charges, expose their bank accounts to unauthorized access, and/or share personal information in the course of applying for fraudulent job postings.

67.    Defendants have not entered into licensing agreements with Capital One, nor have Defendants obtained authorization to act on behalf of Capital One to use the CAPITAL ONE Marks or DISCOVER Marks, alone or in conjunction with additional descriptive wording such as, for example, CAPITAL ONE auto financing or DISCOVER personal loans.

68.    The telephone calls, text messages, emails, and websites from Defendants are not endorsed by, or otherwise associated with, Capital One.

69.    Capital One is not affiliated with Defendants in any manner and has not permitted or authorized Defendants to use the CAPITAL ONE Marks or DISCOVER Marks for any purpose.

70.    Defendants have used the CAPITAL ONE Marks and DISCOVER Marks for their own gain, purporting to offer banking, auto financing, and credit card services, thus usurping the goodwill Capital One developed in the CAPITAL ONE and DISCOVER Marks.

71.    On information and belief, Defendants have deployed multiple types of scams to defraud consumers including, without limitation, "account takeover" "third-party data share," and "authorized payment" scams targeting Capital One customers, wherein Defendants misuse the CAPITAL ONE Marks and DISCOVER Marks without authorization and deceive consumers by falsely purporting to be Plaintiff or sponsored by Plaintiff and offering banking, auto financing, and credit card services.

72.    Account takeover scams are when Defendants fraudulently acquire Capital One customers' credentials, access their accounts, and, upon information and belief, withdraw funds from the accounts.

73.    Third-party data share scams are unauthorized purchases by Defendants who have fraudulently acquired Capital One customers' credentials; these purchases are then posted to Capital One customers' accounts as legitimate.

74.    Authorized payment scams involve Defendants deceptively convincing Capital One customers to send money to the Defendants and/or third parties.

*Telephone Fraud*

75.    Defendants have made infringing telephone and telemarketing calls wherein Defendants wrongfully and illegally masqueraded as Capital One and/or falsely stated that they were acting on behalf of Capital One through use of the CAPITAL ONE Marks or DISCOVER Marks.

76.    For example, Capital One customers have reported to Capital One receiving such calls claiming to be from the "Capital One Fraud Department."

77.    Capital One honors the Do-Not-Call registry, but Defendants' infringing calls impersonating Capital One have also included calls to consumers on the Do-Not-Call registry.

78.    The following call transcripts are representative of unlawful robocalls by Defendants utilizing the CAPITAL ONE or DISCOVER trademarks:

| Call Date | Calling TN | Called TN | Transcript/Message |
|---|---|---|---|
| 2/23/2025 | 1800xxxxxxx | 1205xxxxxxx | Transcription: Hello? Hello on a recorded line. This is from Capital One Auto Finance. Am I speaking with [Redacted]? Oh, sorry, sir. Yes, sir. Who am I speaking with today? Yes, sir. Yes, sir. I'll tag your number as a Listen do not call number, sir. Oh, I'm sorry, sir. About, sir. Oh, I'm sorry. We cannot provide any further information, sir. |
| 4/11/2025 | 1212xxxxxxx | 1360xxxxxxx(3) | Transcription: Hi. Can I speak with the [Redacted]? Hi, sir. My name is Richard Richard Wilson, and I'm calling you from the Discover Bank fraud and security department . Can I speak with miss [Redacted]? Hello? I believe I'm speaking with mister [Redacted]. Right? My name is Richard Wilson, and I'm calling you from the Discover Bank at some verification call, uh, or some later why. We received alright, sir. Uh, we received a application, which is miss [Redacted] with name and her Social Security number ending in [Redacted]. |
| 4/28/2025 | 1800xxxxxxx | 1314xxxxxxx | Transcription: Hi. This call may be monitored or recorded for quality assurance. My name is Irvin, IDSxED. I'm calling from Capital One Auto Finance. I'm trying to reach [Redacted]. |
| 5/9/2025 | 1866xxxxxxx | 1912xxxxxxx | Transcription: Hello. This is Capital One routine monitoring system calling |

| | | | |
|---|---|---|---|
| | | | you to confirm a recent activity.  We have found some unusual activity on your card for the transaction amount of $1,382 from Expedia.com. If you recognize the transaction, press 1.  If you don't recognize the transaction, press 2. |
| 10/06/2025 | 1412xxxxxxx | 1412xxxxxxx | Transcription: Hello.  How are you doing today?  I wanna speak with [Redacted].  Can I speak with [Redacted]?  [Redacted], this is Sam Wirtz.  I'm calling you from Capital One Bank regarding about your credit card.  Give me your page for page.  This is not unwanted call, sir.  Why you wanna do that?  Waste of details.  Sam Warts.  I'm calling you from Capital One Bank regarding about your credit card.  We received a purchase on your credit card account in the amount of $1,200 on Amazon.  Did you use your credit card on Amazon this morning? |
| 10/11/2025 | 1800xxxxxxx(8) | 1267xxxxxxx | Transcription: Thank you for calling Capital One.  I'm Andrew, agent ID EOB244 on a recorded line.  May I Listen have your first and last name? |
| 10/14/2025 | 1412xxxxxxx | 1412xxxxxxx | Transcription: Hello.  How are you doing today?  Uh, this is Marilyn Thompson from Capital One Bank.  Can I speak with mister [Redacted]?  Alright, mister [Redacted].  [Redacted], the reason why we are calling you today, because we recently received some charges on your credit card.  So I just want to confirm, are you the one who made the charge on your credit card?  [Redacted] connect to [Redacted].  You can hang up the call now. |
| 10/17/2025 | 1888xxxxxxx | 1616xxxxxxx | Transcription: Hello?  Can I speak with [Redacted]? Hi.  Fine, sir.  Uh, |

| | | | how are you doing today?  Uh, sir, this is David Miller from security department of Capital One.  So, basically, this is an identity verification call regarding some declined transaction on your credit card.  Did you try to make any purchase online at Amazon for $949?  What happened, sir?  Hello?  Hello? |
|---|---|---|---|
| 10/20/2025 | 1917xxxxxxx | 1814xxxxxxx | Transcription: Hello?  Is that miss [Redacted] number?  Right now, I'm talking with miss [Redacted].  Well, ma'am, my cell is mister Smith, and I'm calling you from the Capital One Bank.  First of all, how are you doing today?  Yes.  Yes, ma'am.  Actually, thing is that we receive a brand new credit card account under your name and Listen under your Social Security number.  So you are the one to apply a brand new credit card account or not. Alright. |

*Fraudulent Text Messages*

79.    Similarly, Defendants have utilized text messages to impersonate Capital One and/or falsely state that they were acting on behalf of Capital One through the use of the CAPITAL ONE Marks or DISCOVER Marks.

80.    Capital One customers have reported receiving such text messages, including from the "Capital One Fraud Department."

81.    The following text message transcripts are representative of the unlawful communications by Defendants utilizing the CAPITAL ONE or DISCOVER trademarks:

| Call Date | Calling TN | Called TN | Transcript/Message |
|---|---|---|---|
| 6/18/2025 | 1704xxxxxxx | 1240xxxxxxx | Message: SMS - Hi, We noticed you registered for our job alerts and wanted to share an exciting opportunity near you.  Flik at Capital One is hiring for Conference Services Attendant positions!If you're ready to join a team that makes a real impact on others, the community, and your own career, this could be the perfect fit!Position Details: Role involves lifting/moving furniture and setting it up at various locations.Schedule: Monday - FridayPay Rate: ><20.00/hour.Ready to apply?  Click here: https://olivia.pa@dox.ai/5QWZm3q & data rates may apply.  Reply STOP to opt out or HELP for help.  Terms & Conditions: https://olivia.pa@dox.ai/Ym4Q41p |
| 10/28/2025 | 1820xxxxxxx | 1xxxxxxxxxx | Message: SMS – Capital One Fraud Did you schedule a transfer to SHARON for the amount of $2,000.00?  Reply YES/NO/HELP. |
| 01/14/2026 (on information and belief) | 1728xxxxxxx | Unknown | Message: SMS - Capital One Account Alert: Did you attempt to use your credit card at Walmart for $676.42 on 01/14 SEQ#407358 Reply YES or NO or STOP to end alerts. Msg & data rates may apply.<br><br>[User responds "No"]<br><br>Thank you for confirming this transaction, for the security of your account, we may place a brief hold and have a representative contact you. |

### *Fraudulent Emails*

82.     Defendants have also sent infringing emails wherein Defendants wrongfully and illegally masqueraded as Capital One and/or falsely stated that they were acting on behalf of Capital One through use of the CAPITAL ONE Marks or DISCOVER Marks.

83.     Defendants' misuse of the CAPITAL ONE Marks or DISCOVER Marks in email impersonations has, in certain circumstances, been undertaken in connection with the misuse of the CAPITAL ONE Marks or DISCOVER Marks in telephone calls and text messages for the purpose of confusing consumers regarding the legitimacy of Defendants' actions.

84.     The following emails illustrate Defendants' unlawful use of the CAPITAL ONE Marks or DISCOVER Marks in business impersonation emails:



Email sent from CapitalOnline_anita@secure.net.

Sign In



# Do you recognize this purchase?

Please let us know if you or an authorized user recognize the purchase below. The sooner we hear from you, the sooner we can help protect your account from unauthorized purchases.

| Date | Merchant Name | Amount | Outcome |
|------|---------------|--------|---------|
| Tuesday, January 27, 2026 | ADULTTIME.COM/PREMIUM | $1.99 | Pending Cardholder Response |

Yes, I Recognize It

No, Something's Wrong

**Some things to consider when reviewing your purchase:**

·    If you respond yes, declined transactions will stay declined. After responding, try your card again.

·    To cancel a legitimate purchase, contact the merchant directly.

·    A pre-authorization can differ from your transaction amount because merchants (typically gas stations) estimate your amount (usually $1–$100) before the transaction is complete.

-25-

         ⨂ Sign in



# You've received an EFT Payment

Dear Valued Customer,

You've received an Electronic Funds Transfer (EFT) payment of **$7,842.92** for your account.

For security reasons, this payment has been placed on **"PENDING"** status. This is because our system indicates that your account may have un-updated or missing personal information. To protect your funds and ensure accurate processing, we require you to verify and update your details immediately so as to have your account fully restored and ensure your payment is deposited securely.

**Update Your Account Now**

During this "PENDING" period, you will temporarily be unable to access any payments or make transactions from your account. We understand this may be inconvenient, and we apologize for any disruption this may cause.

Thank you for choosing Capital One.

On Tue, Nov 4, 2025 at 16:01 Laura Borak <laura.capitalone.staffing@gmail.com> wrote:
Hello,

I hope this message finds you well. My name is Laura Borak, and I serve as Director of Executive Recruiting at Capital One.

After an extensive review of several accomplished executives, your background emerged as one of the most aligned with a confidential leadership mandate we're currently managing. At Capital One, we're driving transformative growth across our technology, product, and strategy divisions, and we're seeking leaders capable of shaping high-impact outcomes on an enterprise scale.

The position offers substantial visibility, strategic authority, and a total compensation range of $250,000–$600,000+, inclusive of full executive benefits.

Would you be open to exploring this opportunity and discussing how it may align with your next phase of career advancement? Once I confirm your interest, I'll share further details regarding the specific role and its compensation structure.

**Best Regards,**
**Laura (Turpin) Borak LINKEDIN**
**Director, Executive Recruiting @ Capital One**
**OUR MISSION :Dedicated to helping customers succeed by simplifying banking and empowering them through innovative solutions and personalized financial experiences.**

Hello,

I noticed that you're currently exploring new career opportunities and wanted to reach out personally regarding **Capital One**. The company is widely recognized for its forward-thinking culture, commitment to innovation, and focus on using technology to drive meaningful customer experiences, making it one of the most dynamic financial institutions globally.

My focus is on helping professionals align their skills and aspirations with areas where organizations like Capital One are actively expanding, ensuring they stand out in a competitive market and position themselves for lasting career success.

To better understand how I can support your career goals, could you share a bit more about your background and interests? For example:

- Which areas within Capital One interest you most (e.g., Business Analysis, Data & Technology, Product Management, Risk, or Strategy)?
- What technical skills, certifications, or experiences best highlight your strengths?
- Are you open to opportunities across different locations or primarily focused on your current region?
- Over the next 12–18 months, what kind of professional growth or development are you most focused on achieving?
- Can you share an example of a time you had to adapt quickly in your role and how you managed that transition?

Your insights will help me identify opportunities most aligned with your goals and Capital One's current areas of growth. My goal is to ensure you're positioned strategically for success.

I look forward to learning more about your professional journey.

Best regards,

--



**Morgan Tisha**
**Human Resources Manager, Capital One**

(312) 856-9100  |  www.bdo.com/

morgantishahiringdesk@gmail.com

330 N Wabash Ave Ste 3200, Chicago, Illinois 60611, US

*Fraudulent Websites (Spoofing Websites)*

85.    Defendants' websites' domain names often include the CAPITAL ONE Marks and/or the DISCOVER Marks.

86.    By appropriating the CAPITAL ONE and DISCOVER marks, it is clear that Defendants registered the domains for the purpose of, *inter alia*, diverting internet visitors when such visitors were attempting to reach Capital One's services.

87. Upon information and belief, Defendants registered the domain names in bad faith so as to ultimately mislead consumers into believing the sites are associated with Capital One and ultimately receive compensation, including monies, when internet visitors are misled to engage with any content on the website to which Defendants' websites resolve, to trick consumers into providing sensitive financial information, and/or to be used to send email for the purpose of unlawful impersonation of Capital One.

88. Upon information and belief, Defendants are wrongfully and illegally masquerading as Capital One through the use of the CAPITAL ONE Marks or DISCOVER Marks. Defendants have no legitimate use of these website domains.

89. Upon information and belief, Defendants registered the domains with the intent to divert consumers away from Capital One's online locations, for commercial gain, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of Defendants' websites.

90. On information and belief, Defendants' misuse of the CAPITAL ONE Marks or DISCOVER Marks in website impersonations has, in certain circumstances, been undertaken in connection with the misuse of the CAPITAL ONE Marks or DISCOVER Marks in telephone calls, text messages, and emails for the purpose of confusing consumers regarding the legitimacy of Defendants' actions.

91. The following website screen captures are representative of the unlawful use of the CAPITAL ONE Marks in business impersonation websites before the sites were disabled:



Screen Capture of https://genius.city/cceaa-045-77be-4012-9bf4-073cf10355b5 (Jan. 19, 2026).



Screen Capture of CapitalOneTrustbk.online (July 14, 2025).



Screen Capture of OneCapital.vip (May 16, 2025).

## CAPITAL ONE'S RESPONSE TO THE HARM SUFFERED BY CUSTOMERS

92.     In recent years, Capital One has noticed a marked increase in the number of scams targeted at Capital One customers and/or the general public through telephone calls, text messages, emails, and websites using the CAPITAL ONE Marks and DISCOVER Marks to confuse consumers about the relationship between Capital One and those persons responsible for the scams, including by duping consumers into authorizing payments to or for the scammers, revealing information that allows the scammers to take over the customer's account, and/or applying for fraudulent job postings.

93.     Many of Capital One's customers and other consumers have succumbed to and will continue to be ensnared and victimized by these telephone, text, email, and website scams. Defendants intended to and did wrongfully obtain unsuspecting Capital One customers' business and/or account information by orchestrating and implementing the scams.

94.     Defendants' illegal telephone calls, texts, emails, and websites have caused, and continue to cause, harm to Capital One, which spends millions of dollars per year attempting to combat these scams.

95.     For instance, in response to the increase in telephone and text scams, Capital One also integrated a call-authentication service into its telephone platform for phone calls originating across the top three U.S. carriers (AT&T, Verizon, and T-Mobile).  The authentication service helps block bad actors from spoofing Capital One's numbers and making contact with their customers or non-customers they are trying to defraud.  On information and belief, it blocked over 10,000 calls spoofing Capital One to consumers in Virginia, and over 1,000,000 calls spoofing Capital One nationally, between June 3, 2025, and September 3, 2025.

96.    In response to the increase in email and website scams, Capital One has engaged in efforts to disable domain names and email accounts used for such scams including through take-down actions, domain name dispute resolution proceedings, and litigation seeking court orders disabling such domain names.

97.    Capital One also pays to deploy internet beacons that alert the company when fraudsters attempt to copy its digital properties.

98.    Capital One further experiences direct financial losses and fraud losses resulting from Defendants' fraudulent schemes, including costs associated with investigating, mitigating, remediating, and reimbursing customers for fraud-related activity.

99.    Additionally, Capital One suffers losses when customers overextend themselves in connection with Defendants' scams and cannot afford to make payments owed to Capital One (e.g., paying their credit card bills), and in certain circumstances pays customers back for losses caused by Defendants.

100.    Capital One also incurs costs in fielding and responding to consumer outreach about Defendants' scams and communications.

101.    Capital One has also suffered reputational harm as a result of Defendants' deliberate confusion of consumers into believing they and their scams are affiliated with Capital One.

102.    Notwithstanding these extensive efforts by Capital One, Defendants (and fraudsters generally) continuously change their tactics and seek to circumvent anti-fraud technologies.

103.    Beyond the harm to itself, Capital One estimates that its customers and other consumers are losing millions of dollars per month due to these types of scams.  FTC, *Top Scams of 2024* (Mar. 10, 2025), https://consumer.ftc.gov/consumer-alerts/2025/03/top-scams-2024.

-34-

104.    Capital One seeks to prevent further harm to consumers and to Capital One by commencing this action, which includes a request for injunctive relief.

105.    Capital One is particularly concerned with preventing its customers and consumers generally from suffering and continuing to suffer from substantial harm at the receiving end of Defendants' illicit telephone calls, text messages, emails, and websites.  The telephone calls, texts, emails, and website usage were and are: (a) harassing to Capital One customers and/or the general public; (b) disturbing Capital One customers' and/or the general public's daily lives; (c) disseminating false statements about affiliation with Capital One to induce consumers to remain on the line or to provide credentials for Capital One accounts or other personal information; (d) persuading consumers to purchase financial services that are not affiliated with Capital One and/or to transact business with an unknown entity believing that such services are associated with Capital One; and/or (e) otherwise confusing Capital One customers about the relationship between Capital One and Defendants.

## COUNT ONE:
### (Trademark Counterfeiting)

106.    Capital One repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

107.    One or more of the Defendants are intentionally and knowingly using counterfeit versions of the CAPITAL ONE Marks and DISCOVER Marks in connection with seeking financial transactions with consumers and/or seeking consumers' account credentials or other personal information.

108.    One or more of the Defendants used spurious designations that are identical with, or substantially indistinguishable from, the CAPITAL ONE Marks and DISCOVER Marks and

purporting to offer banking, auto financing, and credit card services covered by the federal registrations for such marks.

109.    One or more of the Defendants used these spurious designations knowing they are counterfeit in connection with the advertisement, promotion, sale, and offering for sale of goods and/or services.

110.    Use of the CAPITAL ONE Marks and DISCOVER Marks by one or more of the Defendants as set forth above is likely to: (a) cause confusion, mistake, and deception; (b) cause the public to believe that the products and/or services sold by Defendants are authorized, sponsored or approved by Capital One or that Defendants are affiliated, connected, or associated with or in some way related to Capital One; and (c) result in Defendants unfairly benefiting from Capital One advertising and promotion and profiting from the reputation of Capital One and the CAPITAL ONE Marks and DISCOVER Marks all to the substantial and irreparable injury of the public and Capital One, for which monetary relief will not suffice.

111.    The aforesaid acts by Defendants constitute willful trademark counterfeiting in violation of Sections 32 and 34 of the Lanham Act, 15 U.S.C. §§ 1114 and 1116(d)(1).

**COUNT TWO:**
**(Trademark Infringement)**

112.    Capital One repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

113.    Defendants are using the CAPITAL ONE Marks and DISCOVER Marks in commerce and have no valid rights in the CAPITAL ONE Marks and DISCOVER Marks.

114.    Defendants have actual and/or constructive notice, pursuant to Section 22 of the Lanham Act, 15 U.S.C. § 1072, of the existence of Capital One's superior rights in the CAPITAL

ONE Marks and DISCOVER Marks by reason of the existence of Capital One's aforementioned federal trademark rights.

115.   Use of the CAPITAL ONE Marks and DISCOVER Marks by Defendants is without the permission or authorization of Capital One.

116.   On information and belief, Defendants are knowingly using the CAPITAL ONE Marks and the DISCOVER Marks without authorization for the purpose of confusing and/or defrauding consumers.

117.   The aforesaid acts by Defendants have caused and/or are likely to cause confusion, mistake, and/or deception among consumers and the public, leading the public falsely to believe that Defendants and/or the products or services advertised and sold by Defendants are those of, are sponsored or approved by, or are in some way connected with Capital One.  And because Capital One customers filed complaints with Capital One about these communications from Defendants, it is clear that actual confusion indeed occurred.

118.   The aforesaid acts by Defendants constitute direct infringement of Capital One's trademark rights in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114.

119.   The aforesaid acts have caused, and are causing, great and irreparable harm to Capital One and the public.  The harm to Capital One includes harm to the value and goodwill associated with the CAPITAL ONE Marks and DISCOVER Marks for which monetary relief will not suffice.  Unless permanently restrained and enjoined by this Court, said irreparable harm will continue.

**COUNT THREE:**
**(False Designation of Origin)**

120.   Capital One repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

121.   The copying and/or use by Defendants of the CAPITAL ONE Marks and DISCOVER Marks constitutes a false designation of origin that wrongly and falsely designates that goods or services marketed and sold by Defendants now, or in the future, originate from or are connected with, authorized by, or otherwise associated with Capital One.

122.   The above acts by Defendants constitute false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

123.   The foregoing actions of Defendants have been knowing, deliberate, willful, and in utter disregard of Capital One's rights.

124.   The foregoing actions of Defendants have caused great and irreparable injury to Capital One and, unless said acts are enjoined by this Court, said acts will continue and Capital One and consumers will continue to suffer great and irreparable injury for which monetary relief will not suffice.

## COUNT FOUR:
### (False Advertising)

125.   Capital One repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

126.   The use by Defendants of the CAPITAL ONE Marks and DISCOVER Marks in telephone calls, text messages, emails, and websites are literal false or misleading representations of fact that the products or services sold by Defendants are indeed not sponsored by, approved by, or certified by Capital One.

127.   The use by Defendants of the CAPITAL ONE Marks and DISCOVER Marks in telephone calls, text messages, emails, and websites are literal false or misleading representations of fact that Defendants and Capital One are affiliated in some manner.

128. Defendants are using these false representations in order to influence consumers' purchasing decisions by using Capital One's widespread popularity.

129. By placing telephone calls, texts, and emails to consumers throughout the United States, Defendants placed the false or misleading statements into interstate commerce.

130. Defendants' acts have had a material effect on consumers' purchasing decisions by causing consumers to mistakenly believe that telephone calls, text messages, emails, and websites from Defendants that use the CAPITAL ONE Marks or DISCOVER Marks originate from, are sponsored by, approved by, or certified by Capital One.

131. Defendants' acts have also damaged Capital One's goodwill associated with any such products or services sold by Defendants.

132. The above acts by Defendants constitute false advertisements in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

133. The foregoing actions of Defendants have been knowing, deliberate, willful, and in utter disregard of Capital One's rights.

134. Defendants' conduct has caused irreparable damage to Capital One's business and reputation and, unless said acts are enjoined by the Court, said acts will continue and Capital One and the consuming public will continue to suffer great and irreparable injury for which monetary relief will not suffice.

**COUNT FIVE:**
**(Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C.**
**§§ 6101–6108, and Telemarketing Sales Rule, Deceptive Telemarketing Acts or Practices,**
**16 C.F.R. § 310.3)**

135. Capital One repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

136.　　Defendants engaged in deceptive telemarketing practices by misrepresenting their affiliation, endorsement, or sponsorship by falsely claiming to be affiliated with Capital One.

137.　　Defendants have engaged in a pattern or practice of deceptive and abusive telemarketing in violation of the Telemarketing Sales Rule, 16 C.F.R. § 310.3(2)(vii), thereby giving rise to a private right of action under the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6104(a)

138.　　Capital One has suffered not less than $50,000.00 in actual damages due to Defendants' deceptive telemarketing practices causing consumers to mistakenly believe that telemarketing calls and/or texts from Defendants that use the CAPITAL ONE Marks or DISCOVER Marks originate from, are sponsored by, approved by, or certified by Capital One.

139.　　Capital One has provided notice to the FTC of the filing of this claim.

140.　　Defendants' conduct has caused irreparable damage to Capital One's business, reputation, and goodwill, and, unless said acts are enjoined by the Court, said acts will continue and Capital One and the consuming public will continue to suffer great and irreparable injury for which monetary relief will not suffice.

### COUNT SIX:
**(Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101–6108, and Telemarketing Sales Rule, Abusive Telemarketing Acts or Practices, 16 C.F.R. § 310.4)**

141.　　Capital One repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

142.　　Defendants have engaged in abusive telemarketing practices by initiating outbound telephone calls that deliver a prerecorded message and failing to receive the express consent of the recipient in writing that meets the statutory requirements.

143.    Defendants also have failed to make the requisite disclosures in offering or selling goods or services.  Defendants have failed to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call the true identity of the seller and the nature of the good or service provided.

144.    The above acts by Defendants constitute abusive telemarketing practices in violation of the Telemarketing Sales Rule, 16 C.F.R. § 310.4(d)(1) and (3), thereby giving rise to a private right of action under the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6104(a).

145.    Capital One has suffered not less than $50,000.00 in actual damages due to Defendants' misconduct.

146.    Capital One has provided notice to the FTC of the filing of this claim.

147.    Defendants' conduct has caused irreparable damage to Capital One's business, reputation, and goodwill, and, unless said acts are enjoined by the Court, said acts will continue and Capital One and the consuming public will continue to suffer great and irreparable injury for which monetary relief will not suffice.

## COUNT SEVEN:
### (Virginia Unfair Competition)

148.    Capital One repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

149.    Defendants are misrepresenting to consumers that the goods or services provided by Defendants are the goods or services of Capital One in violation of Va. Code Ann. §§ 59.1-200(A)(1).

150.    Defendants are misrepresenting to consumers that Defendants' goods or services are sponsored by, approved by, or certified by Capital One and that Capital One is a source of such goods or services in violation of Va. Code Ann. § 59.1-200(A)(2).

151.    Defendants are misrepresenting to consumers that Defendants' goods or services are affiliated, connected, or associated with Capital One in violation of Va. Code Ann. § 59.1-200(A)(3).

152.    Defendants are misrepresenting to consumers that those services provided by Defendants originate from, or are affiliated with, Capital One in violation of Va. Code Ann. § 59.1-200(A)(6).

153.    Defendants' conduct is in violation of Va. Code Ann. § 59.1-200(A)(14).

154.    The foregoing actions of Defendants have caused great and irreparable injury to Capital One and, unless said acts are enjoined by this Court, said acts will continue, and Capital One and the consuming public will continue to suffer great and irreparable injury for which monetary relief will not suffice.

## COUNT EIGHT:
### (Virginia False Advertising)

155.    Capital One repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

156.    Defendants' conduct advertising for Defendants' goods or services by publishing, disseminating, circulating, or placing before the public information that is untrue, deceptive, or misleading, and/or which uses other methods, devices, or practices which are fraudulent, deceptive or misleading, namely indicating that Capital One endorses or that Capital One is in any way affiliated with Defendants' telephone calls, text messages, emails, and websites, is causing actual confusion in the marketplace in violation of Va. Code Ann. § 18.2-216.

157.    Defendants' advertisements, as described above, contain a false representation, which is untrue, deceptive, and misleading.

158.    Defendants have caused such advertisements to be distributed via telephone calls, text messages, emails, and websites to consumers in Virginia.

159.    Defendants' conduct has caused irreparable damage to Capital One's business, reputation, and goodwill, and, unless said acts are enjoined by the Court, said acts will continue and Capital One and the consuming public will continue to suffer great and irreparable injury for which monetary relief will not suffice.

## PRAYER FOR RELIEF

WHEREFORE, Capital One respectfully requests of this Court:

A.    That judgment be entered in favor of Capital One on all counts.

B.    That the Court preliminarily and permanently enjoin Defendants, their officers, directors, principals, agents, servants, employees, successors, and assigns, and all those in active concert or participation with them, jointly and severally, from:

i.    Copying, distributing, altering, displaying, hosting, selling, and/or promoting the CAPITAL ONE Marks and DISCOVER Marks;

ii.    Using any copy or colorable imitation of the CAPITAL ONE Marks and/or DISCOVER Marks in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, printing, importation, production, circulation, and/or distribution of any product or service, in such fashion as to relate or connect such product or service in any way to Capital One, or to any goods or services sold, manufactured, sponsored, approved by, and/or connected with Capital One;

iii.       Using telephone calls, text messages, emails, or websites to reference, copy, distribute, and/or promote the CAPITAL ONE Marks and DISCOVER Marks; and

iv.       Engaging in any other activity constituting unfair competition with Capital One or constituting an infringement on the CAPITAL ONE Marks and DISCOVER Marks.

C.       That those in active concert or participation with Defendants and those with notice of the injunction, including without limitation any call or text carriers, gateway providers, network providers, transit providers, internet search engines, web hosting and Internet service providers, domain name registrars, domain name registries, and/or financial service providers whose services are used by Defendants in relation to the acts identified herein, cease providing such services to Defendants including facilitating access to any or all domain names, websites, or accounts through which Defendants engage in unlawful access to, use, reproduce, and/or distribute the CAPITAL ONE Marks and DISCOVER Marks and/or seek to deceive consumers regarding their relationship with Capital One;

D.       That Defendants be required, jointly and severally, to pay Plaintiff's statutory damages pursuant to 15 U.S.C. § 1117(c) and 15 U.S.C. § 6104(a);

E.       That an award of actual and compensatory damages be awarded in favor of Capital One against Defendants;

F.       That Defendants be required to disgorge all revenues earned from the operation of telephone calls, text messages, emails, or websites containing counterfeit CAPITAL ONE Marks and DISCOVER Marks;

G.       That the Court order an award of costs and reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117(a), 15 U.S.C. § 6104(d), or as otherwise permitted by law, incurred by Capital One in connection with this action;

H.      That Capital One be awarded pre-judgment interest and post-judgment interest on the above damages awards; and

I.      That the Court order an award to Capital One of such other and further relief as the Court may deem just and proper.


May 12, 2026                           By:   /s/Attison L. Barnes, III
                                             Attison L. Barnes, III (VA Bar No. 30458)
                                             David E. Weslow (*for pro hac vice*)
                                             Kevin G. Rupy (*for pro hac vice*)
                                             Kahlil Epps (*for pro hac vice*)
                                             WILEY REIN LLP
                                             2050 M Street NW
                                             Washington, DC 20036
                                             Tel: (202) 719-7000
                                             abarnes@wiley.law
                                             dweslow@wiley.law
                                             krupy@wiley.law
                                             Kepps@wiley.law

                                             *Counsel for Plaintiff*
                                             *Capital One Financial Corporation*

-45-